UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTA LEWELLYN and TODD LEWELLYN
O/B/O J.L. AND L.L.,

      Plaintiffs,

v.                  Case No.:  8:07-cv-1712-T-33TGW

SARASOTA COUNTY SCHOOL BOARD,

      Defendant.
_____/

**ORDER**

This cause is before the Court pursuant to Defendant
Sarasota County School Board's Motion for Summary Judgment
(Doc. # 81), which was filed on September 30, 2009.  On
November 13, 2009, Plaintiffs Krista and Todd Lewellyn filed
a response in opposition to the Motion for Summary Judgment.
(Doc. # 90).

For the reasons that follow, this Court will grant the
Motion for Summary Judgment.

**I.  Factual Background**

Plaintiffs are the parents of two disabled minors, J.L.
and L.L. (Doc. # 37 at ¶ 3).[1]  At the time of the filing of
the operative complaint in this case on July 21, 2008, J.L.
was 15 years old, and L.L. was 14 years old. (Doc. # 37 at ¶¶

_____

[1] Defendant does not object to the classification of J.L.
and L.L. as disabled.

14, 17).  Plaintiffs allege that Defendant, the Sarasota County School Board, failed to provide J.L. and L.L. with a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400, *et seq*.  In addition, Plaintiffs contend that the School Board failed to comply with the procedural requirements of the IDEA.

Plaintiffs allege in the Third Amended Complaint that J.L. has "well documented" learning disabilities, which include:

> Attention Deficit Hyperactivity Disorder ("ADHD"); Cognitive deficits in *Visual Spacial Thinking, Auditory Processing, and Speed Processing*; Academic deficits in both *Written Expression* and *Math Calculation*; [a] Medical condition which causes a *Physical/Speech Impediment* due to an as yet un-resolved cleft pallet [sic] from birth; [and] . . . "*bullying*" and "*physical intimidation*" directed at J.L. on a regular basis.

(Doc. # 37 at ¶ 15)(emphasis in original).[2]

Plaintiffs allege that L.L. suffers from ADHD, a cognitive deficit in "*Processing Speed*" and an academic deficit in "*Written Expression*" and "*Math Calculation*." (Id.

_____

[2] Although Plaintiffs indicate in the operative complaint that J.L.'s cleft palate is unresolved, the record reflects that J.L.'s palate was repaired when he was an infant. (Doc. # 77 at 3-4).  However, it appears that J.L. continues to struggle with cleft palate issues including, but not limited to, verbal communication.

at ¶ 18)(emphasis in original). Despite these specific learning disabilities and other obstacles, Plaintiffs allege that J.L. and L.L. are "otherwise qualified" to participate in all facets of education within the Sarasota County Public School District. (Doc. # 37 at ¶ 15).

In addition to IDEA violations, Plaintiffs allege that Defendant punished and retaliated against J.L. and L.L. on the basis of their disabilities in violation of the Americans with Disabilities Act and other laws.

The record shows that Venice Area Middle School ("VAMS") is J.L. and L.L.'s "districted school" but Defendant allowed J.L. and L.L. to attend Laurel Nokomis Middle School ("LNMS") on student reassignment. (Doc. # 37 at ¶ 20). L.L. was compelled to leave LNMS and resume his education at his districted school of VAMS. When L.L. was compelled to leave LNMS, his parents decided to move J.L. back to VAMS so that the children could attend school together.

Nancy Dubin is the Principal of LNMS. (Doc. # 82-2 at ¶ 2). Principal Dubin explains the circumstances of the boys' change in schools in her affidavit:

> Laurel Nokomis School was not L.L.'s districted school L.L. was at Laurel Nokomis School on a student reassignment. The reassignment was not required inasmuch as L.L.'s districted school was able to satisfy his educational needs. To the

> contrary, attendance at Laurel Nokomis School was
> allowed in order for L.L. to attend school along
> with his older sister who was attending Laurel
> Nokomis School.

(<u>Id.</u> at ¶ 6).

Principal Dubin explains that "under the terms of a student reassignment, the School Board gives a student who does not live in a particular school district" the privilege to attend a non-districted school. (<u>Id.</u> at ¶ 7). One of the conditions for attendance at a non-districted school is good behavior--in order to keep the privilege, the student must abide by the non-districted school's Code of Conduct. (<u>Id.</u> at ¶ 8). Further, "since reassignment is more of a privilege rather than a right, a student's reassignment can be revoked at any time." (<u>Id.</u> at ¶ 8).

Principal Dubin states that, "near the end of the 2005-2006 school year, L.L. was involved in three specific acts that warranted the revocation of his reassignment: (1) pushing a student, (2) pushing scissors at a student, and (3) threatening to harm another student." (<u>Id.</u> at ¶ 9). The Defendant warned L.L. and his parents that L.L.'s behavior was in violation of the school's Code of Conduct; however, L.L. continued to exhibit "maladaptive behavior." (<u>Id.</u> at ¶¶ 10-11).

Principal Dubin decided to revoke L.L.'s reassignment and determined that L.L. should return to his districted school of VAMS for the 2006-2007 school year. (Id. at ¶ 11). Plaintiffs objected to the change in schools, and L.L. was able to start the next school year at LNMS. However, in October 2006, L.L. physically attacked another student and was suspended for 10 days. (Doc. # 82-2 at ¶ 15). Thereafter, Defendant removed L.L. from LNMS and reassigned L.L. to VAMS. (Id. at ¶ 16).

Principal Dubin states that "the decision to revoke L.L.'s reassignment" and return L.L. to VAMS "was based on his maladaptive behavior and not on his disability. Moreover, the decision to revoke L.L.'s reassignment to [LNMS] was not a result of retaliation against his parents." (Id. at ¶ 17).[3]

As for J.L., Principal Dubin states, "At no time while J.L. was a student at [LNMS] did I ever make any attempts to revoke his reassignment or take any negative actions against him. Nor were there ever any complaints that the staff discriminated against J.L. or retaliated against J.L. In fact, J.L. was welcome to remain at [LNMS], his parents

---

[3] Principal Dubin also explains in her affidavit that "Non-disabled students who behave in the manner in which L.L. behaved would have been disciplined in the same fashion except they would not have been afforded the procedural safeguards that applied to L.L." (Id. at ¶ 22).

ultimately decided to remove him from [LNMS] and have him attend school with [L.L.]." (Id. at ¶ 25).

In November 2006, both L.L. and J.L. were enrolled at VAMS, and Jack Turgeon was the Principal of VAMS. He states in his affidavit that in November 2006, J.L. threatened to "shoot" and "kill" fellow students. (Mr. Turgeon Aff. Doc. # 84-2 at ¶ 7). J.L. was "suspended for 10 days pending expulsion." (Id. at ¶ 7). Because J.L. has a disability, he was treated more favorably and was offered "deferred expulsion" with a "behavior agreement." (Id. at ¶¶ 8-9).

The record reflects that J.L. and L.L. received Manifestation Hearings before Defendant ever imposed disciplinary measures against them. As explained in the affidavit of Michael Santagata, Defendant's EBD (Emotional Behavioral Disability) Program Specialist:

> [T]he District Disciplinary Procedures provide that if the IEP team determines, during the Manifestation Determination Hearing, that a student's behavior was not related to the disability then the student can be disciplined and served in a different setting in the same manner as a non-disabled student. If the IEP team determines that a student's behavior was a manifestation of his/her disability then the student cannot be moved to a different setting unless the IEP team has determined that it is the most appropriate placement.

(Mr. Santagata Aff. Doc. # 82-4 at ¶ 8-9). Mr. Santagata also explained that he was on the IEP team that determined, after a Manifestation Hearing, that L.L.'s inappropriate behavior of violence against another student at LNMS was not related to his disability. (Id. at ¶¶ 11-12).

Mr. Santagata also stated in his affidavit that, when J.L. "threatened to shoot/kill other students" at VAMS, the "IEP team conducted a Manifestation Determination Hearing to determine whether J.L.'s behavior was related to his disability." (Id. at ¶¶ 14-15). The team determined that J.L.'s behavior was not related to his disability and that such behavior warranted expulsion. (Id. at ¶ 16). Furthermore, Mr. Santagata indicated that the Defendant's separate decisions to punish J.L. and L.L. were "based on nonconforming behavior and not based on disability." (Id. at ¶¶ 12, 17).

Further, Mr. Santagata stated that the punishment was "consistent with the punishment of others who had committed similar actions" and was free of retaliatory motives. (Id. at ¶¶ 12, 17-18).

Regardless of the procedures that Defendant took to ensure that J.L. and L.L. were treated fairly and in compliance with the District's procedures, Plaintiffs rejected

the "offer" of deferred expulsion for J.L., and they removed L.L. and J.L. from VAMS entirely.  Plaintiffs then "requested private school placement along with all IEP services at public expense" and "homebound education." (Doc. # 37 at ¶ 43, 47).  Defendant did not agree to fund the additional services requested by Plaintiffs.

## II.  **Administrative Proceedings**

On October 25, 2006, Plaintiffs filed a "written notice of appeal and request for Due Process Hearing of the First and Second Manifestation Hearing held at Laurel Nokomis Middle School regarding L.L." (Doc. # 37-2 at 2).  On November 29, 2006, a similar written notice, appeal, and request for Due Process Hearing was requested by Plaintiffs for J.L. (<u>Id.</u> at 4).

According to Administrative Law Judge Daniel M. Kilbride, the two cases were set for "Expedited Due Process Hearings" for December 14 and 15, 2006. (<u>Id.</u> at 6).  However, at the request of the parties, the Due Process Hearings were postponed. (<u>Id.</u> at 6).  The Due Process Hearings were re-set for January 4-5, but were also cancelled at the parties' request. (<u>Id.</u> at 6, 8).

On January 3, 2007, the parties informed ALJ Kilbride that "an interim settlement was imminent." (<u>Id.</u> at 8).  After

a hearing, ALJ Kilbride approved the interim settlement agreement. (Id. at 9). However, on June 1, 2007, the Plaintiffs informed the ALJ that settlement was no longer an option and requested a Due Process Hearing. (Id. at 11).

On August 22, 2007, Judge Kilbride issued a 20-page opinion dismissing Plaintiffs' appeals. ALJ Kilbride approved the IEPs for J.L. and L.L. and directed the parties to comply with the IEPs. (Doc. # 37-2 at 20). In addition, he determined that Plaintiffs were asking for relief that was not available under the IDEA. (Id. at 19). Despite the lengthy opinion issued by the ALJ, it should be noted that the ALJ did not receive evidence in this case or create an administrative record for this Court's review.

In addition, the ALJ did not answer the pivotal question of whether J.L. and L.L received a FAPE. Both parties characterize the ALJ's dismissal of the cases as a "mootness determination." The Court struggles to classify the ALJ's 20-page discussion of the case as a mootness determination. However, because the ALJ did not address whether the Defendant provided a FAPE for J.L. and L.L., his opinion is the legal equivalent of a mootness determination for the purpose of the Court's review.

### III. **Procedural History and the Third Amended Complaint**

On September 21, 2007, Plaintiffs filed the present suit against Defendant in this Court. (Doc. # 1). Plaintiffs filed their Third Amended Complaint (the operative complaint) on July 21, 2008. (Doc. # 37). In Count I, Plaintiffs request that this Court review and reverse the ALJ's decision.

In Count II, Plaintiffs allege that Defendant violated the IDEA, *inter alia*, by failing to provide L.L. and J.L. with a FAPE. (Id. at ¶¶ 79-85). Plaintiffs request the following relief for Defendant's alleged violation of the IDEA: "re-evaluation at [Defendant's] sole expense of J.L. and L.L. by [Plaintiffs'] choice of qualified professional along with all compensatory education requirements arising from each such minor, disabled child's respective re-evaluation; and/or damages." Plaintiffs also request reimbursement of attorney's fees and litigation costs pursuant to 20 U.S.C. § 1415(i)(3)(B). (Id. at ¶ 85). Furthermore, Plaintiffs request that this Court "Support [Plaintiffs'] future requests for revocation of [Defendant's] funding under IDEA based on the Court's final disposition of these cases." (Id.)

In Count III, Plaintiffs contend that Defendant violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 by discriminating against and retaliating against J.L. and

L.L. on the basis of their disabilities. (<u>Id.</u> at ¶ 89).
Plaintiffs request the entry of a declaratory judgment stating
that Defendant's practices, policies, and procedures have
subjected J.L. and L.L. to discrimination. In addition,
Plaintiffs request an injunction against Defendant as well as
compensatory damages, costs and attorney's fees. (<u>Id.</u> at ¶
105).

In Count IV, Plaintiffs allege that Defendant violated
the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §
12132, *et seq.*, by discriminating against and retaliating
against J.L. and L.L. on the basis of their disabilities. (<u>Id.</u>
at ¶¶ 106-120). Plaintiffs request declaratory and injunctive
relief along with compensatory damages, attorney's fees, and
costs. (<u>Id.</u> at ¶ 120).

In Count V, Plaintiffs assert that Defendant, acting
through its agents under color of law, violated the Fifth and
Fourteenth Amendments to the United States Constitution.
Thus, through the Civil Rights Act, 42 U.S.C. § 1983,
Plaintiffs seek punitive damages, "civil rights remedies,"
injunctive relief, attorney's fees, and costs. (<u>Id.</u> at ¶ 140).

Defendant sought dismissal of the Third Amended
Complaint, *inter alia*, on the basis of the absence of an

administrative record from the ALJ. (Doc. # 46). The Court denied Defendant's motion to dismiss. (Doc. # 65).

On September 30, 2009, Defendant filed its Motion for Summary Judgment on all complaint counts. (Doc. # 81). The Motion is ripe for the Court's review and will be granted for the reasons that follow.

## IV. **Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the

governing law.  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646
(11th Cir. 1997).  The moving party bears the initial burden
of showing the court, by reference to materials on file, that
there are no genuine issues of material fact that should be
decided at trial.  Hickson Corp. v. N. Crossarm Co., 357 F.3d
1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986)).  "When a moving party has
discharged its burden, the non-moving party must then 'go
beyond the pleadings,' and by its own affidavits, or by
'depositions, answers to interrogatories, and admissions on
file,' designate specific facts showing that there is a
genuine issue for trial."  Jeffery v. Sarasota White Sox,
Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex,
477 U.S. at 324).

    If there is a conflict between the parties' allegations
or evidence, the non-moving party's evidence is presumed to be
true and all reasonable inferences must be drawn in the non-
moving party's favor.  Shotz v. City of Plantation, Fla., 344
F.3d 1161, 1164 (11th Cir. 2003).  If a reasonable fact finder
evaluating the evidence could draw more than one inference
from the facts, and if that inference introduces a genuine
issue of material fact, the court should not grant summary
judgment.  Samples ex rel. Samples v. City of Atlanta, 846

F.2d 1328, 1330 (11th Cir. 1988) (citing <u>Augusta Iron & Steel</u>
<u>Works, Inc. v. Employers Ins. of Wausau</u>, 835 F.2d 855, 856
(11th Cir. 1988)).   However, if the non-movant's response
consists of nothing "more than a repetition of his
conclusional allegations," summary judgment is not only
proper, but required.   <u>Morris v. Ross</u>, 663 F.2d 1032, 1034
(11th Cir. 1981).

As will be discussed in greater detail below, the
aforementioned Rule 56 summary judgment standard is not
applicable to certain IDEA claims.

## V.  <u>Analysis</u>

### A.  <u>Counts I and II under the IDEA</u>

Defendant moves for summary judgment on Counts I and II
of Plaintiffs' complaint asserted under the IDEA.   In Count I,
Plaintiffs request the Court review the ALJ's dismissal of
J.L. and L.L.'s cases.   In Count II, Plaintiffs request that
the Court find that Defendant violated the IDEA.   Differing
standards apply to Counts I and II.

As explained in <u>Loren F. v. Atlanta Indep. Sch. Sys.</u>, 349
F.3d 1309 (11th Cir. 2003), "the usual Rule 56 summary
judgment principals do not apply with an IDEA case.  This is
not surprising because no IDEA jury trial right exists."  <u>Id.</u>
at 1313.  Further, the Court is instructed to conduct Rule 52

fact finding in IDEA cases "even on a record bearing evidence tendered in addition to the IDEA administrative record, subject to the requirement" that the Court "accord due weight to administrative findings." Id. (internal citations omitted). Recently, the Eleventh Circuit determined that the Court should review the ALJ's findings de novo and decide what weight to accord ALJ findings. CP v. Leon County Sch. Bd., 483 F.3d 1151, 1156 (11th Cir. 2007).

There is no administrative record in this case. The Court will therefore conduct a de novo review of the case and consider all evidence supplied by the parties.

## 1. **The IDEA**

The IDEA guarantees all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. § 1400(d)(1)(A); J.P. v. Cherokee County Bd. of Educ., 218 F. App'x 911, 913-914 (11th Cir. 2007); Sch. Bd. of Collier County v. K.C., 285 F.3d 977, 979 (11th Cir. 2002).

Federal funds are made available to state and local educational entities which are required, through an evaluation process, to identify children with disabilities and to develop for each disabled child an annual individualized education

program or IEP. 20 U.S.C. §§ 1411-1415. The IEP is formulated by the school during a meeting between the student's parents and school officials. Loren F., 349 F.3d at 1312 (citing 20 U.S.C. § 1414(d)(1)(A)-(B)). "A parent who wishes to challenge an IEP, or any matter relating to the provision of a FAPE, may request an 'impartial due process hearing' before an ALJ." J.P., 218 F. App'x at 912.

If a FAPE is not provided by the public school, a parent may place their child in private school and seek reimbursement from the public school for the cost of private education. 20 U.S.C. § 1412(a)(10)(C)(ii). The Eleventh Circuit has cautioned, however, "Even where a FAPE is not provided, courts can nevertheless deny reimbursement if a parent's own actions frustrated the school's efforts." Loren F., 394 F.3d at 1312.

## 2.   **Did J.L. and L.L. Receive a FAPE?**

Plaintiffs argue that J.L. and L.L. did not receive a FAPE and allude to several procedural issues with J.L. and L.L.'s IEPs; however, in Bd. of Educ. v. Rowley, 458 U.S. 176 (1982), the Court determined that a procedurally defective IEP, alone, does not result in the denial of a FAPE. Mrs. Lewellyn, the mother of the two disabled students at issue, filed a single-spaced, 33-page affidavit detailing school yard squabbles, progress reports, and other accounts of day-to-day

school activities.[4]  She feels that her children were bullied and unfairly treated by Defendant.  She describes meetings that she had with teachers as well as her analysis of other student's hand-written letters concerning her children.[5]

The Court is sensitive to Mrs. Lewellyn's desire to protect her children and to provide them with every advantage in life.  However, it is not this federal tribunal's role to agonize over who pushed whom down in the sandbox.  Neither is it the Court's role to determine if certain referrals to the Principal's office were, indeed, warranted.

The IDEA guarantees a free and appropriate education, not a perfect education.  Plaintiffs' complaints about J.L. and

---

[4] She complains that "Defendant John Delp" a teacher "wrote in L.L.'s agenda that L.L. was behind 'six assignments in writing' noted L.L. had not been on task in class, had refused to do his work and had an 'F' in the class.  A frown was written next to the text. No plan to address these issues was proffered." (Mrs. Lewellyn Aff. Doc. # 90-2 at ¶ 34).  It appears that Mrs. Lewellyn blames the Defendant and Defendant's educators for her child's failure to complete assignments.  While the IDEA places substantial duties on schools with respect to disabled students, it does not prohibit teachers, such as Mr. Delp, from accurately reporting a student's progress to a parent on an "agenda" and does not shift the burden of completing assignments from the student to the teacher.

[5] Mrs. Lewellyn alleges that, based on her own "independent investigation" and "the handwriting and stories" contained in statements of other children, L.L. was framed for bullying. (Mrs. Lewellyn Aff. Doc. # 90-2 at ¶ 96).

L.L.'s curriculum, IEPs, and disciplinary procedures are a thinly-veiled attempt to micro-manage the Defendant and the Defendant's educators.  The Eleventh Circuit has made quite clear that "under the IDEA, there is no entitlement to the 'best' program." <u>M.M. v. Sch. Bd. of Miami Dade County</u>, 437 F.3d 1085, 1102 (11th Cir. 2006).  "[P]arents, no matter how well-motivated, do not have a right under the statute to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child." <u>Id.</u> (internal citations omitted).

In this case, evaluating the evidence in a light most favorable to Plaintiffs, summary judgment in favor of Defendant is warranted.  Defendant's educators filed affidavits explaining that J.L. and L.L. advanced through the grades and passed state achievement tests.  L.L. was even found to be gifted in the area of Language Arts. (Mrs. Lewellyn Aff. Doc. # 90-2 at ¶ 226).

### a.  <u>Dr. Gil Lichtshein</u>

Plaintiffs' expert cannot refute Defendant's affidavits. In fact, a close reading of Plaintiffs' expert's report and deposition testimony shows that J.L. and L.L. did receive a FAPE.  Plaintiffs' expert witness is Dr. Gil Lichtshein, a psychiatrist.  During his deposition, Dr. Lichtshein clearly

stated that he is not an educator and is not an expert on IEPs. (Dr. Lichtshein Dep. Doc. # 90-4 at 38:21-25; 39:1-5; 68:12-18). Dr. Lichtshein noted that he would defer to an educator on most IEP issues. (Id. at 47:17-24). Dr. Lichtshein also stated that he would defer to an educator as to issues concerning expulsion and suspension from school. (Id. at 49:3-24). Dr. Lichtshein noted that he has never been a party to a child's Manifestation Determination Hearing. (Id. at 50:2-3).

Dr. Lichtshein evaluated J.L. and L.L. for several hours on June 20, 2009. His detailed "Psychiatric Evaluation" reports were filed on August 4, 2009. (Doc. # 77). On the date of the evaluation J.L. was 16 years old, and L.L. was 15 years old. (Id. at 3, 11). Dr. Lichtshein noted that J.L. was home-schooled for part of the eighth grade but "then started the 9th grade the following academic year at Venice High School. No behavioral problems have been alleged. However, [J.L.] has continued to suffer bullying and harassment by peers." (Id. at 5).

Dr. Lichtshein also commented that J.L. is currently on the school wrestling team and "tends to struggle academically but with the IEP's and other team measures put into place by the Venice High School Administration and Staff, has been able

to progress both academically and socially." (_Id._)  Further, since starting high school, "there have been no reported problems with his behaviors and there have been no referrals or other disciplinary actions taken for any reason." (_Id._ at 10).

As for L.L., the younger of the two boys, Dr. Lichtshein reports that after a short period of home schooling, L.L. "graduated middle school and will be starting high school in a couple months and with the proper IEP accommodations, Assistive Technology and Positive Behavior Plan implemented, [L.L.] demonstrates that he can succeed both academically and socially." (_Id._ at 17).

During his deposition, Dr. Lichtshein did not give the opinion that J.L. and L.L. were ever denied a FAPE.  In addition, Dr. Lichtshein did not testify that Defendant wrongfully punished, discriminated against, or retaliated against J.L. and L.L.  In sum, Dr. Lichtshein did not give testimony that called into question the clearly articulated opinions of Defendant's educators that J.L. and L.L. did receive a FAPE and that the Defendant complied with the IDEA.

## b.  Defendant's Educators

Michael McHugh, former ESE Director for Defendant, stated in his affidavit that he reviewed the educational files for

J.L. and L.L., including "grades, discipline records, IEPs, recommendations and evaluations" to determine if J.L. and L.L. were "provided the necessary supports, services and accommodations in order to meet the District, State and Federal requirements as they relate to the education of students with disabilities." (Mr. McHugh Aff. Doc. # 87 at ¶¶ 5, 8).

Mr. McHugh determined that J.L. and L.L. were "provided all of the necessary supports, services, counseling and/or accommodations necessary to meet the standards set by the District, and State to satisfy the pupil progression plan and also met the requirements of the IDEA." (Id. at ¶¶ 5, 8).

Mr. McHugh also noted that J.L. and L.L. "moved successfully from grade to grade and passed the required State testing with satisfactory achievement." (Id. at ¶¶ 6, 9). Mr. McHugh concluded that the IEPs developed for J.L. and L.L. "were designed with input from the parents, and in some cases the parent's advocate, and said IEPs were appropriately designed to address L.L. [and J.L.'s] academic, behavioral and social [and] emotional needs and provide a FAPE." (Id. at ¶¶ 7, 10).

Sonia Figaredo-Alberts, the Executive Director of Pupil Support Services for Defendant, provided similar testimony

regarding the educational files for J.L. and L.L. Ms. Figaredo-Alberts stated in her affidavit that J.L. and L.L. "have been provided, and [are] currently being provided, all of the necessary supports, services, counseling and/or accommodations necessary to meet the standards of the pupil progression plan and [to] satisfy any and all State standards and IDEA requirements." (Ms. Figaredo-Alberts Aff. Doc. # 82-3 at ¶¶ 6, 10). Ms. Figaredo-Alberts also noted that "the parents of L.L. and J.L. have never indicated during my meetings with them that the IEPs developed for L.L. and J.L. were anything other than appropriate." (Id. at ¶ 13).

### c. **Mrs. Lewellyn**

The lengthy affidavit of Mrs. Lewellyn does not refute the affidavits of Defendant's educators. In her affidavit, Mrs. Lewellyn provided a day-by-day account of J.L. and L.L's school days, including teachers' remarks. For example: "March 16, 2009, Ms. Kanaan (S.S) wrote in L.L's agenda that L.L. had a 'good day' and notes that L.L. 'participates and is eager to answer questions' and advised of upcoming vocabulary test." (Mrs. Lewellyn Aff. Doc. # 90-2 at ¶ 47). Similar notes of good and bad days at school are not helpful to the Court's

analysis here.[6]     Further, it should be noted that Mrs.

Lewellyn states in her affidavit that both boys are doing well

and that L.L. was "found to be gifted in Language Arts (and

falling just shy of the score point to be deemed gifted in

Mathematics.)" (Mrs. Lewellyn Aff. Doc. # 90-2 at ¶ 226).

### 3.  **IDEA Compliance**

In determining whether there has been a violation of the

IDEA, the Court must determine whether the State has complied

with the procedures of the IDEA, and whether the IEP developed

for a child is reasonably calculated to enable the child to

receive educational benefits. <u>Rowley</u>, 458 U.S. at 189.

---

[6] Mrs. Lewellyn notes that she agreed with the School's
decision to suspend L.L. for pushing another student to the
ground on or about March 24, 2006 (Mrs. Lewellyn Aff. Doc. #
90-2 at ¶ 51-52).  However, she was not quite certain that it
was appropriate for L.L. to be excluded from going on a field
trip because he had been referred to the Principal's office.
(Doc. # 90-2 at ¶ 63, 65).  Mrs. Lewellyn's affidavit does not
contain any factual allegations that create a genuine issue of
material fact.   Her allegations concerning "playground
incidents" are not material to this suit. (Doc. # 90-2 at ¶
99).   She has not come close to calling into question the
affidavits of the educators concerning the material issues in
this suit, including, but not limited to, whether Defendant
violated the IDEA, whether J.L. and L.L received a FAPE, and
wether J.L. and L.L. were discriminated against or retaliated
against.  Further, Plaintiffs' 15-page "response" to
Defendant's affidavits (Doc. # 90-3) is a procedurally
defective filing that does not create a genuine issue of
material fact.

The record contains evidence that the IEPs developed for L.L. and J.L. were reasonably calculated to enable L.L. and J.L. to receive educational benefits. This is consistent with the ALJ's findings that the IEPs were indeed appropriate. The specific evidence that the Court is relying upon includes the affidavits of Ms. Figaredo-Alberts and Mr. McHugh. There is no evidence on file to contradict the statements made by Ms. Figaredo-Alberts and Mr. McHugh.

Further, Mr. Lewellyn testified at his deposition that he was not aware of any type of compensatory education L.L. requires as a result of any alleged wrongdoing on the part of the Defendant. (Mr. Lewellyn Dep. Doc. # at 35:25; 34:4).[7] Similarly, Mrs. Lewellyn testified that there were no compensatory services that her children need that the Defendant has not already provided. (Mrs. Lewelleyn Dep. 103:1-4). Mrs. Lewellyn also testified that there were no re-evaluations by qualified professionals warranted at this time. (Mrs. Lewellyn Dep. 103:1-4).[8]

_____

[7] After Mr. Lewellyn's deposition, he completed an "errata sheet" wherein he indicated that he did not understand the questions asked. (Doc. # 83-3 at 70).

[8] In Count II of the Third Amended Complaint, Plaintiffs request (1) "re-evaluation at Respondent's sole expense of both J.L. and L.L. by Petitioners' choice of qualified
(continued...)

The Court determines that the Defendant is entitled to summary judgment on Plaintiffs' IDEA claims. J.L. and L.L. have not been denied a FAPE. There is uncontroverted evidence in Defendant's favor in support of the proposition that the IEPs in question were appropriately developed to ensure that J.L. and L.L. received an educational benefit. The record supports that J.L. and L.L. have successfully progressed from grade to grade and are on their way to high school graduation. The Court is well aware of the <u>Rowley</u> Court's position: "We do not hold today that every handicapped child who is advancing from grade to grade is automatically receiving a [FAPE]." 458 U.S. at 203. However, as in <u>Rowley</u>, the Plaintiffs in the present case have not presented evidence to establish an IDEA violation.

---

[8](...continued)
professional along with all compensatory education requirements arising from each such minor, disabled child's respective re-evaluation; and/or damages, as appropriate to remedy the losses suffered by Petitioners." (Doc. # 37 at 33). This request for relief is mooted by Plaintiffs' deposition statements and the record as a whole. Also wholly unsupported is Plaintiffs' request that the Court support Plaintiffs' "request for revocation of [Defendant's] funding under the IDEA based on the Court's final disposition of these cases." (Doc. # 37 at 33).

The Court affirms the ALJ's finding that the IEPs were appropriate. The Court determines that the Defendant did not violate the IDEA.

The Court accordingly grants Defendant's Motion for Summary Judgment as to Counts I and II of the Third Amended Complaint.

## B. Counts III and IV under Section 504 and the ADA

Plaintiffs also sue the Defendant for discrimination and retaliation under the ADA and Section 504 of the Rehabilitation Act. Plaintiffs' ADA and Rehabilitation Act claims are all analyzed under the same McDonnell Douglas burden-shifting analysis as Title VII cases. Wascura v. City of S. Miami, 257 F.3d 1238, 1242 (11th Cir. 2001); Cash v. Smith, 231 F.3d 1301, 1305 (11th Cir. 2000)("Discrimination claims under the Rehabilitation Act are governed by the same standards as used in ADA cases" and "[c]ases decided under the Rehabilitation Act are precedent for cases under the ADA, and vice versa").

### 1. Discrimination

To establish a *prima facie* case of discrimination under the ADA and Section 504 of the Rehabilitation Act, Plaintiffs must establish: (1) that J.L. and L.L. have disabilities; (2) that J.L. and L.L. are qualified individuals; and (3) that

J.L. and L.L. were subjected to discrimination on the basis of their disabilities.  <u>Morisky v. Broward County</u>, 80 F.3d 445, 447 (11th Cir. 1996).

After Plaintiffs establish a *prima facie* case, Defendant must present a legitimate, non-discriminatory reason for the adverse actions that it took.  <u>Wascura</u>, 257 F.3d at 1242.  The Eleventh Circuit has stated that Defendant's burden, at this stage, is "exceedingly light and easily established." <u>Perryman v. Johnson Prods. Co., Inc.</u>, 698 F.2d 1138, 1142 (11th Cir. 1983).

Once Defendant has articulated a non-discriminatory reason for the actions that it took, Plaintiffs must show that Defendant's stated reason is pretextual.  <u>Wascura</u>, 257 F.3d at 1242.  Specifically, to discharge their burden, Plaintiffs must show that Defendant possessed a discriminatory intent or that the Defendant's espoused non-discriminatory reason is a mere pretext for discrimination.  <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981).

Defendant indicates that it is not disputed that Plaintiffs have satisfied the first two prongs--that J.L. and L.L. are disabled and are qualified to participate in Defendant's educational programs.  As to the third prong,

Defendant asserts that it never discriminated against J.L. and
L.L.

Plaintiffs, on the other hand, argue that Defendant
discriminated against both students. Particularly, Plaintiffs
contend that Defendant discriminated against L.L. by revoking
his student reassignment to LNMS and sending him to his
districted school (VAMS). In addition, Plaintiffs complain
that L.L. was wrongfully placed in an advanced English class
when he scored well on a school achievement test.

Plaintiffs argue that Defendant discriminated against
J.L. when Defendant expelled him from VAMS after he threatened
to harm other students at VAMS. Plaintiffs also take issue
with certain teachers' comments to J.L. and L.L. with respect
to the completion of assignments and participation (or refusal
to participate) in class. During her deposition, Mrs.
Lewellyn insisted that Defendant discriminated against her
sons, but could not provide a concrete example of such
discrimination.[9]

_____

[9] For example, when asked how Defendant's employee,
Bobbie Clinch, discriminated against J.L., Mrs. Lewellyn
responded: "She blatantly discriminated against [J.L.] based
on his disabilities and his physical disability, his
impairment knowing that he has them, because I provided her
personally with an IEP." (Mrs. Lewellyn Dep. Doc. # 83-2 at
19-25; 20:1). During her deposition, Mrs. Lewellyn failed to
(continued...)

The Court determines that Defendant did not discriminate against J.L. and L.L. Defendant revoked L.L.'s ability to attend LNMS after multiple incidents of violence and expelled J.L. from VAMS after Defendant determined that J.L. threatened other students.

Here, Plaintiffs have tendered no evidence to show that Defendant discriminated against J.L. and L.L. However, even if the Court were to assume, *arguendo*, that Plaintiffs have established a *prima facie* case of discrimination, Defendant still prevails. That is because Defendant has offered a legitimate and non-discriminatory reason for taking action against J.L. and L.L. Specifically, Defendant punished J.L. and L.L. (pursuant to Manifestation Determination Hearings) after finding that J.L. and L.L. violated the Schools' Code of Conduct.

Plaintiffs may not agree with Defendant as to the punishment for the actions of J.L. and L.L., but Plaintiffs cannot show that the reason offered is a pretext and cannot show any discriminatory animus toward J.L. and L.L. Further, Defendant has submitted uncontroverted affidavits from

---

[9](...continued)
link any discriminatory conduct by Defendant to her sons' disabilities.

Principal Dubin, Principal Turgeon, and Mr. Santagata (EBD Specialist) indicating that J.L. and L.L. were disciplined due to their inappropriate conduct, that the inappropriate conduct was not related to a disability, and that the punishment levied against J.L. and L.L. was not due to their disabilities.

## 2. Retaliation

Plaintiffs' retaliation claims are also unavailing. ADA and Section 504 retaliation claims are addressed using the same analytical framework as Title VII cases. Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 (11th Cir. 1997). To establish a *prima facie* case of retaliation, Plaintiffs must establish (1) a statutorily protected expression; (2) adverse action; and (3) a causal link between the protected expression and the adverse action. Goldsmith v. City Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993). The goal of this provision is to prevent "interfer[ence] (through retaliation) with a [plaintiff's] efforts to secure or advance enforcement of the Act's basic guarantees," including freedom from discrimination. Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 63 (2006).

Accordingly, retaliation is a separate offense, and a plaintiff "need not prove the underlying claim of

discrimination for the retaliation claim to succeed." <u>Sullivan</u> <u>v. Nat'l R.R. Passenger Corp.</u>, 170 F.3d 1056, 1059 (11th Cir. 1999)(citations omitted). The McDonnell Douglas burden-shifting analysis for a retaliation claim is analogous to the burden-shifting analysis employed for a discrimination claim when circumstantial evidence is used to allege retaliation. <u>Johnson v. Booker T. Washington Bd. Serv.</u>, 234 F.3d 501, 507 at n.6 (11th Cir. 2000); <u>see also</u> <u>James v. Ala. Dep't of Revenue</u>, 206 F. App'x 869, 871 (11th Cir. 2006). If a plaintiff makes out a *prima facie* case of retaliation, the burden shifts to the defendant to produce legitimate reasons for the adverse action. <u>Brochu v. City of Riviera Beach</u>, 304 F.3d 1144, 1155 (11th Cir. 2002).

"If the defendant offers legitimate reasons, the presumption of retaliation disappears", and "[t]he plaintiff must then show that the [defendant's] proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." <u>Sullivan</u>, 170 F.3d at 1059 (internal quotations and citations omitted). "The plaintiff must [then] prove by a preponderance of the evidence that the legitimate reasons offered for taking the adverse action were not . . . true reasons." <u>DeLong v. Best Buy Co.</u>, 211 F. App'x

856, 858 (11th Cir. 2006)(citing <u>Reeves v. Sanderson Plumbing</u> <u>Products, Inc.</u>, 530 U.S. 133, 143 (2000)).

In this case, it is undisputed that Mrs. Lewellyn engaged in statutorily-protected expression when she requested a Due Process hearing with the DOAH. Plaintiffs claim that J.L. and L.L. were punished and treated unfairly because of the request for a Due Process hearing and because Mrs. Lewellyn was a strong advocate for her children.

However, upon review of the record, the Court determines that Plaintiffs failed to state a *prima facie* case of retaliation because there is no causal connection between the request for a Due Process hearing and the alleged retaliatory action.

In order to establish the requisite causal connection, "a plaintiff must show that the decision makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." <u>Gupta v. Fla. Bd.</u> <u>of Regents</u>, 212 F.3d 571, 590 (11th Cir. 2000) (quotations omitted). In this case, there is no causal connection. The Plaintiffs focus on L.L.'s removal from LNMS and transfer to VAMS as retaliatory conduct. However, Plaintiffs did not petition the Department of Administrative Hearings or file

suit in this case (the protected expression) until after L.L.'s removal from LNMS.

Principal Dubin states in her affidavit that she did not remove L.L. from LNMS as an act of retaliation. (Ms. Dubin Aff. Doc. # 82-2 at ¶¶ 17, 19-20). The protected conduct did not occur until after L.L.'s removal from LNMS. Principal Dubin states, "Since the DOAH proceedings and litigation did not start until after L.L. had gone to Venice Middle School [VAMS], I did not know about the filing of claims with DOAH and the federal court when the determination was made to discipline L.L." (<u>Id.</u> at ¶ 26).

Similarly, Principal Turgeon indicates in his affidavit that he did not discipline J.L. at VAMS as a result of retaliation, and this makes sense because the discipline came before the protected conduct of initiating a complaint with the DOAH or this Court. Mr. Turgeon states: "The DOAH proceedings and litigation did not start until after J.L. had been disciplined. I did not know about the filing of claims with DOAH and the federal court when the determination was made to discipline J.L." (Mr. Turgeon Aff. Doc. # 84-2 at ¶ 10).

Accordingly, the Court determines that Defendant is entitled to summary judgment on Plaintiffs' ADA and

Rehabilitation Act discrimination and retaliation claims as asserted in complaint Counts III and IV.

## C.  **Count V under Section 1983**

Section 1983 creates a federal remedy for deprivations of federal rights. <u>Wideman v. Shallowford Cty. Hosp.</u>, 826 F.2d 1030, 1032 (11th Cir. 1987). An actionable Section 1983 claim requires proof of a deprivation of rights, privileges, or immunities secured by the Constitution and the laws of the United States and that the deprivation was by a person acting under color of law. <u>Arrington v. Cobb County</u>, 139 F.3d 865, 872 (11th Cir. 1998) (internal citations omitted).

In Count V, Plaintiffs allege that Defendant, acting through its agents under color of law, intentionally deprived Plaintiffs of their rights under the Fifth and Fourteenth Amendments to the United States Constitution.[10] Mr. Lewellyn answered in the negative when asked the following questions:

> Do you know what, if any, actions the School Board and/or its employees took that were intentional or

---

[10] Plaintiffs and Defendant concur that a Section 1983 claim cannot be based on an alleged violation of the IDEA, the ADA, or Section 504 of the Rehabilitation Act. <u>See</u> <u>Sammons v. Polk County Sch. Bd.</u>, 8:04-cv-2657-T-24EAJ, 2007 U.S. Dist. LEXIS 90725 at *10 (M.D. Fla. Dec. 10, 2007)(a Section 1983 claim cannot be based solely on an IDEA violation); <u>Holbrook</u>, 112 F.3d at 1531 ("[A] plaintiff may not maintain a section 1983 action in lieu of–or in addition to–a Rehabilitation Act or ADA cause of action").

deliberately used to violate L.L's protected
rights?;
Do you know of any way that the School Board or its
employees intentionally lied, forged documents, or
misled you with respect to any rights that you all
were afforded to enforce L.L.'s educational
rights?;
Are you aware of any fraud, intentional
misrepresentation, or forgery on the part of the
School Board or any of its employees as it relates
in any way to your son L.L.'s education?;
Are you aware of any policy, custom, or practice
that the School Board regularly engages in that
violates the IDEA, Section 504, Section 1983, or
the Florida Civil Rights Act?;
Can you tell me anything specifically or in general
that the School Board did that would have deprived
J.L. of his rights under Section 1983 and the
Florida Civil Rights Act?;
Can you tell me anything, general or specific, that
the School Board did that would have violated the
J.L.'s substantive and/or procedural due process
rights under the IDEA?;
Can you tell me anything general or specific that
the School Board did that would have violated any
procedural or substantive due process rights of
your son, J.L.?

(Mr. Lewellyn Dep. Doc. # 83-3 at 34-44).

Although Mrs. Lewellyn filed a lengthy affidavit, she
also failed to identify an actionable violation by Defendant.
She contends that L.L. and J.L. were denied First Amendment
freedoms, but she failed to substantiate these claims.[11]  Her
accusations do not prevent the Court from granting Defendant's
Motion for Summary Judgment. Plaintiffs have not come forward

---

[11] In addition, the operative complaint is devoid of First
Amendment claims.

with evidence to substantiate the allegation that Defendant violated a constitutional right. The Court grants Defendant summary judgment as to Count V.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant Sarasota County School Board's Motion for Summary Judgment (Doc. # 81) is **GRANTED.**

(2) The Clerk is directed to enter **JUDGMENT** in favor of Defendant and thereafter, **CLOSE THIS CASE.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>29th</u> day of December, 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies to: All Counsel of Record